# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GOODMAN NETWORKS INCORPORATED, *et al.*,[1] | ) | Case No. 17-31575 (MI) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## DECLARATION OF JOHN DEBUS,
### INTERIM CHIEF FINANCIAL OFFICER OF
### GOODMAN NETWORKS INCORPORATED, IN SUPPORT
### OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, John Debus, hereby declare under penalty of perjury:

1.      I am the interim Chief Financial Officer of Goodman Networks Incorporated ("Goodman") and a managing director of FTI Consulting, Inc. ("FTI").  Goodman is a privately-held corporation organized under the laws of the state of Texas.  FTI entered into an engagement letter with the Debtors on November 22, 2016, pursuant to which I was appointed to serve as Goodman's Chief Financial Officer and principal accounting officer on an interim basis.

2.      In my capacity as interim Chief Financial Officer, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records, as well as the Debtors' restructuring efforts.  I am above 18 years of age, and I am competent to testify.

3.      The Debtors have filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have also filed a motion

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Goodman Networks Incorporated (9460); Goodman Networks Services, LLC (8389); and Multiband Field Services, Inc. (1746) (collectively, the "Debtors").  The location of the Debtors' service address is 2801 Network Blvd., Suite 300, Frisco, Texas 75034.

seeking joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

4.      I submit this declaration to provide an overview of the Debtors' business, capital structure, and restructuring efforts, these chapter 11 cases, and the Plan (as defined herein), and to support the Debtors' chapter 11 petitions and "first day" pleadings.  I am authorized to submit this declaration on behalf of the Debtors.  Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information I have received from other members of the Debtors' management or advisors.  If I were called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

### Preliminary Statement

5.      Goodman is a leading provider of field services to the satellite television industry, professional services and network infrastructure to the telecommunications industry, and installation and maintenance services for satellite communications.  Some of Goodman's notable competitors include MasTec, Inc., Bechtel Corporation, Black & Veatch Corporation, Dycom Industries, Inc. ("Dycom"), and UniTek Global Services, Inc.  The Debtors provide services to their customers through three operating divisions:  (a) the field services segment (the "Field Services Segment"), which includes onsite installation, upgrade, and maintenance services for satellite television systems; (b) the professional services segment (the "Professional Services Segment"), which includes technical services related to the design and optimization of backhaul and central office equipment for wireless networks; and (c) the infrastructure services segment

2

(the "Infrastructure Services Segment"), which includes services related to the maintenance and decommissioning of wireless and wireline networks.[2]

6.      The Debtors are headquartered in Frisco, Texas, and employ more than 3,400 individuals across thirty-five offices in the United States.  The Debtors' customers are some of the largest carriers and original equipment manufacturers in the telecommunications industry, including AT&T Services, Inc. ("AT&T"), Sprint, Verizon Wireless, Alcatel-Lucent Nokia, Duke University, and the United States Air Force.  In particular, AT&T accounts represented nearly 83 percent of revenues in 2016.  In the twelve months ended December 31, 2016, the Debtors generated revenues totaling approximately $379.7 million on a consolidated basis.

7.      Since its founding in 2000, Goodman has held various state and federal minority business enterprise ("MBE") certifications, which provide important lobbying, advocacy, customer, and other business benefits, as well as recognition for public utility procurements.  The company's founders and controlling equity holders have been responsible for obtaining and maintaining Goodman's MBE status.  Goodman has, in turn, established a track-record—well known in the industry—for reliable service and continued growth and has generally performed well financially.  A series of strategic acquisitions in 2013, coupled with reduced service demands from AT&T, however, has led to increased debt and significant revenue declines. More specifically, the substantial completion of AT&T's 4G network build-out has diminished the associated demand for Goodman's services.  Goodman's dedication to AT&T, coupled with the completion of its large recent project, has stymied growth.  These developments have led to

---

[2]      Among the Debtors, Multiband Field Services, Inc. operates the Field Services Segment, and Goodman operates the Professional Services Segment and the Infrastructure Services Segment.  Goodman Network Services, LLC is a guarantor on Goodman's funded debt obligations; however, it does not have its own substantial assets or other business operations.

3

substantial revenue declines across the Debtors' Professional Services Segment and Infrastructure Services Segment.

8.      The Debtors have $325 million of outstanding indebtedness in the form of 12.125% senior secured notes due July 2018 (collectively, the "Secured Notes"). The Debtors have semi-annual interest obligations in each of January and July, which total approximately $40 million. In the face of declining service demands from AT&T (and corresponding revenue declines), Goodman's interest obligations on the Secured Notes has caused a drain on liquidity and stress on the business.

9.      Based on these challenges, the Debtors began exploring solutions in early 2016 to right-size their capital structure and maximize their prospects for long-term success. These efforts also focused on protecting the Debtors' MBE status, which is a critical component of the Debtors' ability to maintain and develop customer relationships and pursue growth opportunities. Since that time, the Debtors have worked productively with a group of holders of approximately 75 percent of the outstanding principal amount of the Secured Notes (the "Consenting Noteholders"), AT&T, and a group of holders of existing common stock in Goodman (such common stock, the "Goodman Interests"), including John Goodman, Jason Goodman, James Goodman, Jonathan Goodman, Joseph Goodman, and Scott Pickett (collectively, the "Consenting Equityholders"), to address Goodman's balance sheet and go-forward operations.

10.     In January 2017, the Debtors, the Consenting Noteholders, and the Consenting Equityholders, in consultation with AT&T, reached an agreement on a comprehensive balance-sheet restructuring. The agreements of the Debtors, Consenting Noteholders, and Consenting Equityholders are memorialized in the Restructuring Support and Forbearance

Agreement dated as of January 24, 2017 (the "RSA"), a copy of which is attached as **Exhibit A** hereto.  On March 3, 2017, as contemplated in the RSA, the Debtors commenced solicitation on their chapter 11 prepackaged plan of reorganization (the "Plan").[3]

11.     The key terms of the Plan include the following:

- the secured noteholders will receive their pro rata share of (a) $25 million in cash, (b) $112.5 million in aggregate principal amount of new 8.00% senior secured notes due 2022 (the "New Secured Notes"), (c) new payment-in-kind preferred stock in reorganized Goodman ("Reorganized Goodman") having an initial liquidation value of $80 million (such payment-in-kind preferred stock, collectively, the "New PIK Preferred Stock"), and (d) 42 percent of the common stock in Reorganized Goodman;

- all holders of existing Goodman Interests will maintain ownership (on a pro rata basis) of 7.9 percent of the common stock in Reorganized Goodman;

- all outstanding and undisputed general unsecured claims will be unimpaired and paid in full in cash;[4] and

- all administrative claims, priority tax claims, priority claims, and secured claims shall be paid in full in cash or receive such other customary treatment that renders such claims unimpaired under the Bankruptcy Code.

12.     The Plan also safeguards the Debtors' go-forward MBE status because of its importance to the business.  Specifically, Reorganized Goodman will enter into a consulting agreement with John Goodman, Jason Goodman, Jonathan Goodman, and James Goodman (collectively, the "Goodman MBE Group") to, among other things, preserve the Debtors' existing MBE status.  In exchange for these services, the Goodman MBE Group will receive (a) New PIK Preferred Stock with an initial liquidation value of $20 million and (b) 50.1 percent

---

[3]     The proposed deadline to vote on the Plan is April 3, 2017, at 4:00 p.m. (the "Voting Deadline"). Contemporaneously herewith, the Debtors have filed a motion seeking approval of a confirmation schedule, including a request to set a hearing on confirmation of the Plan and approval of a related disclosure statement for on or about April 19, 2017.

[4]     As set forth herein, the Debtors are seeking relief to continue honoring general unsecured claims in the ordinary course of business throughout these cases.

of the common stock in Reorganized Goodman.  As recognized in the RSA and Plan, each of the RSA parties agrees that maintaining MBE status is essential to business operations and maximizing stakeholder recoveries.

13.     In conjunction with the RSA and the Debtors' prepetition solicitation process, the Debtors also engaged with MidCap Financial Trust, the administrative agent and lender (together, in both such capacities, the "Credit Facility Lender"), regarding the treatment of the Debtors' prepetition revolving credit facility (the "Credit Facility").  After good-faith negotiations, the Credit Facility Lender agreed to forbear from exercising remedies with respect to certain defaults in return for the pay-down of all outstanding amounts under the Credit Facility on March 8, 2017.  In addition, the Credit Facility Lender has committed to provide a $25 million post-emergence revolving credit facility (the "Exit Facility") on substantially the same terms as the prepetition Credit Facility.  The Exit Facility will ensure that the Debtors' reorganized balance sheet is appropriately capitalized.

14.     On a post-reorganization basis, the transactions in the Plan would result in a reduction of outstanding funded indebtedness by more than $212.5 million as well as significantly reducing interest expense.  These restructuring transactions will therefore substantially de-lever the Debtors' balance sheet, providing the stability and financial flexibility to grow the business.

15.     To familiarize the Court with the Debtors and the requested "first-day" relief, this declaration is organized in three parts.  Part I describes the Debtors' business and capital structure.  Part II details the circumstances surrounding the commencement of these chapter 11 cases and the Debtors' prepetition restructuring efforts.  Part III sets forth the relevant facts in support of the first day pleadings filed in connection with these chapter 11 cases.

KE 45147417

**Part I.**
**General Background**

## I.     The Debtors' Businesses.

16.     Goodman, the parent company of the Debtors' subsidiaries, is a privately-held corporation primarily owned and controlled by the Consenting Equityholders.  Goodman was founded in 2000 by John Goodman—the Debtors' current Executive Chairman, Chief Executive Officer, and President—along with his brothers Jason, Jonathan, Joseph, and James Goodman. Under the Goodman brothers' leadership, the Debtors quickly established themselves as a leading telecommunications service provider, increasing revenues from approximately $35 million in 2004 to approximately $1.2 billion in 2014.   In the twelve months ended December 31, 2016, the Debtors generated revenues totaling approximately $379.7 million on a consolidated basis.

17.     The Debtors operate through three primary divisions:   the Field Services Segment; the Professional Services Segment; and the Infrastructure Services Segment.  Within these segments, the Debtors generate nearly all of their revenues under master service agreements ("MSAs") with their major customers.   These MSAs establish a framework, including pricing, work to be performed, and other terms, for providing ongoing services.  The MSAs, however, generally do not commit customers to use the Debtors' services for any continued length of time or for future projects.

18.     Both currently and historically, the Debtors' most critical MSAs have been with AT&T, dating back to 2002 with Cingular Wireless LLC and Southwestern Bell Telephone Company.  Between 2014 and 2016, the Debtors also provided small cell or distributed antenna systems ("DAS") services to approximately one hundred enterprises, including higher education

institutions, stadiums for professional and collegiate sports events, hotels and resorts, retailers, hospitals, and government agencies.

### A.     Field Services Segment.

19.     The Debtors' Field Services Segment employs approximately 2,800 technicians, who provide installation and maintenance services primarily for DIRECTV satellite television systems.   The Debtors provide DIRECTV satellite television installation and maintenance services in fourteen (14) states pursuant to a multi-year MSA that currently expires on October 15, 2018, and contains an automatic one-year renewal.  During each of 2014, 2015, and 2016, the Debtors completed approximately 1.5 million satellite television installations and upgrade or maintenance work orders for DIRECTV, representing approximately 28.0 percent of all of DIRECTV's outsourced work orders for residents of single-family homes in each of these years.   The Debtors estimate that they were the second largest AT&T in-home installation provider in the United States in each of 2014, 2015, and 2016.

20.     The Debtors also have a MSA with DIRECTV to install equipment for multi-dwelling unit facilities (the "MDU-DIRECTV MSA").   The MDU-DIRECTV MSA currently runs through 2018, contains an automatic one-year renewal, and may be terminated by either party upon 180 days' notice.

21.     Separately, on January 25, 2016, the Debtors signed a 90-day agreement with AT&T to provide smart home security service ("Digital Life") installation and repair services in connection with its DIRECTV satellite television installation offerings.  The Digital Life contract renews annually, but either party has the right to terminate the agreement upon 60 days' notice.

### B.     Professional Services Segment.

22.     The Debtors employ approximately fifty (50) telecommunications engineers and technicians in the Professional Services Segment who provide highly technical services primarily

related to the design, engineering, integration, and performance optimization of transport and core equipment of enterprise and wireless carrier networks. When a network operator integrates a new element into its live network or performs a network-wide upgrade, a team of the Debtors' engineers administers the complete network design, equipment compatibility assessments and configuration guidelines, the migration of data traffic onto the new or modified network, and the network activation. In addition, the Debtors provide services related to the engineering and installation of indoor small cell and DAS networks. The Debtors' enterprise small cell and DAS customers often require all or most of the services described under the Infrastructure Services Segment, and may also purchase consulting, post-deployment monitoring, performance optimization, and maintenance services.

### C.    Infrastructure Services Segment.

23.    Through the Infrastructure Services Segment, the Debtors provide program management services for field projects necessary to maintain or decommission wireless and wireline networks. In particular, this business was involved in the installation of 4G networks for AT&T and other customers. Because the Debtors' customers make significant network upgrades on a cyclical basis, the Infrastructure Services Segment historically has been subject to the booms and busts of those cycles.

24.    As discussed in <u>Part II</u>, on July 6, 2016, the Debtors completed the sale of certain assets utilized in the Infrastructure Services Segment to Dycom. Accordingly, the Debtors have shifted the focus of their overall operations from the Infrastructure Services Segment to the Field Services Segment. Further, as also explained below, performance in the Infrastructure Services Segment has recently declined as AT&T and other customers have primarily completed the installation of their 4G networks.

KE 45147417

### D.       The Debtors' MBE Status.

25.       Since their founding in July 2000, the Debtors have continuously held MBE certifications from certain state and federal authorities.  The Debtors are MBE-certified by the National Minority Supplier Development Council (the "NMSDC"), which certificate is issued by the Dallas-Fort Worth Minority Supplier Development Council.[5]  The NMSDC certification is based on, among other things, minority individuals owning and controlling the management and operations of Goodman.  Specifically, the Goodman brothers are Hispanic and own and control the company.  The Goodman brothers' continued ownership and control of the business is the best way to protect both the MBE certifications and existing customer relationships.  In addition to the NMSDC certification, the Debtors are currently MBE-certified by other local and multi-state agencies, including the California Public Utilities Commission, the Texas Historically Underutilized Business Program, and the State of New York Minority and Women's Business Development.

26.       Because of their MBE certifications, the Debtors receive benefits from the NMSDC and other organizations, including certain lobbying and advocacy benefits.  MBE status provides important business benefits, including technical assistance, potential business leads and procurement opportunities, as well as access to top corporate purchasing agents.  The Debtors are recognized as an MBE when competing for procurements by public utilities, which status provides a key competitive advantage over non-MBE certified competitors.  Moreover, certain of the Debtors' current and potential customers strongly consider MBE status when awarding new business and may withdraw or reduce business if the Debtors were to lose their MBE certifications.

---

[5]     The Dallas-Fort Worth Minority Supplier Development Council is the local arm of the NMSDC in the region in which the Debtors are headquartered.

KE 45147417

27.     MBE status is integral to the Debtors' success.  The ability of the Debtors' MSA counterparties to withdraw or withhold future business further underscores the importance of the MBE certifications.  Therefore, the Debtors have taken efforts to maintain their MBE status through the proposed restructuring, while also securing the significant deleveraging benefits contemplated by the RSA and the Plan.

## II.     The Debtors' Corporate and Capital Structure.

28.     The Debtors' corporate structure is depicted below.  The Debtors comprise three domestic entities:  Goodman, Multiband Field Services Incorporated, and Goodman Network Services, LLC.  Goodman also wholly owns certain non-Debtor foreign subsidiaries, which entities are not obligors or guarantors of any of the Debtors' funded debt or other primary liabilities.  Goodman is in the process of winding down and dissolving certain of the foreign subsidiaries because they are not necessary to the go-forward business and there are no active foreign business operations.



29.     As of the Petition Date, Goodman has approximately 912,754 outstanding shares of common stock, par value $0.01.  The Consenting Equityholders directly or indirectly hold or control approximately 80 percent of the outstanding Goodman common stock.

11

30.    The Debtors' consolidated funded debt historically included both $325 million in aggregate principal amount of Secured Notes and amounts periodically drawn under the Credit Facility.  As further described in <u>Part II</u>, the Debtors agreed with the Credit Facility Lender to pay down and terminate the Credit Facility on March 8, 2017.  The Debtors have fully satisfied all claims under the prepetition Credit Facility as of the Petition Date.

31.    On June 23, 2011, pursuant to the indenture by and between the Debtors and Wells Fargo Bank, National Association, as indenture trustee, the Debtors issued $225 million of Secured Notes.  On June 13, 2013, the Debtors issued an additional $100 million in Secured Notes in a subsequent "tack-on" offering pursuant to the indenture.

32.    The Secured Notes mature on July 1, 2018, and require semi-annual interest payments fixed at 12.125 percent on January 1 and July 1 of each year.  Goodman Networks Incorporated is the issuer of the Secured Notes, which are guaranteed by all current and future wholly-owned material domestic subsidiaries.  Previously, the Secured Notes obligations were secured by (a) a first-priority lien on substantially all of the Debtors' assets other than the collateral securing the Credit Facility and (b) a second-priority lien on the collateral securing the Credit Facility obligations.  Because of the prepetition termination and satisfaction of the Credit Facility claims, the Secured Notes now maintain first-priority liens on substantially all of the Debtors' assets.

**Part II.**
**<u>Events Leading to These Chapter 11 Cases</u>**

**I.    The Debtors' Capital Expenditures to Expand their Business.**

33.    The Debtors used a substantial portion of the proceeds of the Secured Notes to expand their service offerings across the satellite television industry, the small cell and DAS lines, and wireline businesses through a series of strategic acquisitions.  On February 28, 2013,

12

the Debtors completed the acquisition of the Custom Solutions Group of Cellular Specialties, Inc. ("Custom Solutions")—a company that provided indoor and outdoor wireless DAS and carrier Wi-Fi solutions, services, consultations, and maintenance.  The Custom Solutions acquisition significantly strengthened the Debtors' position in rapidly growing segments of the wireless infrastructure industry, specifically in-building DAS, small cells, and Wi-Fi offload segments.

34.     Five months later—in August 2013—Goodman acquired Design Build Technologies, LLC ("DBT"), a full-service wireless construction company that previously constructed and maintained communications towers for major network operators across the Southeastern United States.  The addition of DBT's assets and workforce enhanced the Debtors' cellular tower capabilities related to the installation of 4G networks.  The DBT and the Custom Solutions acquisitions, however, have not been value accretive to the Debtors.  And although the acquisition costs alone did not stress the Debtors' business, the fact that neither transaction led to significant increases in revenue has played a role in the Debtors' current financial situation.

35.     On August 30, 2013, Goodman completed the acquisition of Multiband Corporation ("Multiband"), a company focused on engineering, installation, and maintenance services for DIRECTV and other service providers.  Through the acquisition, the size of the Debtors' technical workforce increased dramatically.  This expanded workforce enabled the Debtors to increase their offerings and service coverage, and recently has expanded its focus to include installations of AT&T's Digital Life service.  In addition to acquiring a technically sophisticated workforce, the Multiband acquisition allowed the Debtors to pursue new strategic capabilities, including the installation, maintenance, and upgrades of satellite television systems

for residential and commercial customers.   The Debtors also inherited Multiband's customer relationship with DIRECTV.

36.     The Multiband acquisition had significant operational potential for the Debtors' continued growth, particularly through the expansion of the AT&T and DIRECTV relationship. On the other hand, its approximate $102.4 million purchase price also required the Debtors to issue an additional $100 million in Secured Notes to fund the acquisition.   Even though Multiband-related revenues have been stable since 2013, Multiband has not generated sufficient growth to offset the $100 million in debt incurred through the acquisition.

37.     Goodman's acquisition strategy increased the Debtors' debt obligations and has inhibited future growth because of the associated interest burden of approximately $40 million on an annual basis.

## II.     The Debtors' Declining Revenues.

### A.     AT&T and DIRECTV.

38.     Over the past two years, the Debtors have experienced critical revenue declines across the Professional Services Segment and the Infrastructure Services Segment.   These declines have greatly outpaced the relative gains made in the Field Services Segment during that same period.   Specifically, the Debtors' Professional Services Segment and Infrastructure Services Segment have suffered from considerable profit margin contractions due, in part, to AT&T spending cuts related to network upgrades.   This is largely attributed to AT&T having recently substantially completed the roll-out of its upgraded 4G networks.

39.     These cuts have had a major effect on the business because AT&T, including DIRECTV, represents a large majority of the Debtors' revenues.   For example, in each of 2014, 2015, and 2016, AT&T-related business represented approximately 64.3 percent, 77.7 percent, and nearly 83 percent, respectively, of the Debtors' revenues on a consolidated basis.   The

Debtors have also become increasingly dependent on AT&T's business due to consolidation in the telecommunications industry, including AT&T itself. For instance, in July 2015, AT&T acquired DIRECTV by merger, and DIRECTV became a subsidiary of AT&T.

### B. Other Customers.

40. In addition to spending cuts at AT&T and DIRECTV, the Debtors have experienced revenue declines in their Professional Services Segment due to (a) a diminishing volume of engineering services provided to Alcatel-Lucent USA, Inc. ("Alcatel-Lucent Nokia") and (b) a reduction of DAS services provided to Duke University after completing installations in multiple buildings on Duke's campus. Specifically, revenues for the Professional Services Segment decreased by $20 million, or 27.8 percent, to $51.7 million for the year ended December 31, 2016. This is compared to $71.7 million for the year ended December 31, 2015. Although this decline was partially offset by an increase in the services provided under the Debtors' contract with Cellco Partnership, d/b/a Verizon Wireless, the Debtors currently expect that their aggregate revenues from Alcatel-Lucent Nokia will continue to decline in the future.

41. Revenues for the Infrastructure Services Segment increased by $2.3 million, or 15.4 percent, to $17.2 million for the year ended December 31, 2016. This compares to $14.9 million for the year ended December 31, 2015. The increase was due in large part to the Debtors' new contracts with both Sprint/United Management Company and the United States Air Force. While the Debtors have not yet completed a full year of performance with these contracts on their books, they expect that the contracts will produce approximately 11 percent of Goodman's consolidated annual revenues in 2017.

### III.     Out-of-Court Restructuring Initiatives.

42.     Under normal operating conditions, the Debtors' steady cash flows enable them to reliably service their funded debt obligations and weather ordinary variations in customer demands.  But the current operating conditions and attendant enterprise-wide liquidity challenges have made the Debtors' debt-service obligations unsustainable.  Thus, in early 2016, the Debtors began exploring solutions to right-size their balance sheet and maximize prospects for long-term success.  Critical to these efforts was protecting and maintaining the Debtors' MBE status, an essential component of safeguarding customer relationships and enabling future partnerships.

43.     With their advisors, the Debtors engaged an ad hoc group of holders of Secured Notes—which group subsequently expanded and became the Consenting Noteholders—in good-faith discussions regarding various restructuring alternatives.  The goal of these discussions, as explained below, was to explore all viable in-court and out-of-court restructuring alternatives that would both substantially deleverage the Debtors' balance sheet and maximize value.  Importantly, AT&T played an active and constructive role in these negotiations, with the goal of ensuring that the Debtors would provide uninterrupted, quality services to AT&T and DIRECTV.

44.     In connection with the balance-sheet restructuring initiatives, the Debtors also took efforts to improve operational performance and restructure overhead costs.  In recent months, these measures included the reduction of over fifty personnel and other efforts to better line up SG&A overhead with the revenues supporting the business.

#### A.     Dycom Sale.

45.     In considering their overall restructuring strategy, the Debtors also explored other strategic alternatives that would both enhance the value of their business and provide substantial, immediate returns through the sale of certain non-core assets.  To that end, the Debtors

16

negotiated the sale of certain assets related to their wireless network deployment and wireline businesses—including a significant portion of the Debtors' business with AT&T and its non-DIRECTV subsidiaries—to Dycom.  On June 2, 2016, the Debtors and Dycom entered into an asset and purchase agreement (as amended, restated, or otherwise supplemented from time to time, the "Dycom Agreement").

46.     On July 6, 2016, the Dycom Agreement was amended to, among other things, require that an additional $10 million of the sale proceeds be deposited into an indemnity escrow account to secure the Debtors' indemnification obligations until certain conditions are fulfilled.  In addition, the Debtors agreed not to provide (a) certain wireless services in the United States and Canada to AT&T, (b) certain small cell services to AT&T in certain geographic areas, and (c) wireline services in the United States and Canada, with certain exceptions, each through August 31, 2020.  Under the Dycom Agreement, the Debtors may perform home and business installation and maintenance services; however, certain work for multi-system cable operators may be restricted through July 6, 2018.

47.     The Debtors and Dycom consummated the sale on July 6, 2016, for a cash purchase price of approximately $107.5 million, subject to an estimated working capital adjustment of $4.7 million.  $22.5 million of the sale proceeds were deposited into an indemnity escrow account, the majority of which will be held until certain conditions are fulfilled relating to potential Texas sales tax liabilities and the Debtors' restructuring.[6]  Utilization of a portion of the Dycom sale proceeds has been key to the Debtors' business in funding operating expenses and restructuring efforts.  The remaining proceeds of the Dycom sale have been deposited in a

---

[6]     As further detailed in the disclosure statement related to the Plan, the State of Texas has asserted an approximate $34.4 million sales tax claim against the Debtors, which the Debtors dispute in its entirety.  The Debtors believe that all or a portion of any such liability (if actually owed to the State of Texas) is reimbursable by AT&T.  The parties are continuing good-faith discussions with respect to a potential resolution of the dispute.

Texas Legacy Bank account, which is subject to the liens and security interests related to the Secured Notes.

### B.     Spring and Summer 2016 Negotiations.

48.     Starting in the spring of 2016, the Debtors, the Consenting Noteholders, and AT&T began to explore comprehensive restructuring alternatives.  These efforts included the exchange of diligence and several in-person meetings between representatives and advisors of the Debtors and the Consenting Noteholders.  The Debtors and the Consenting Noteholders considered, among other alternatives, an out-of-court exchange of the Secured Notes, as well as certain in-court transactions.

49.     In the summer of 2016, these discussions escalated, with the Debtors and the Consenting Noteholders negotiating the terms of a potential in-court or out-of-court transaction through which the Secured Notes would be exchanged for a combination of cash, new secured notes, and equity.  During this period, the Debtors also elected to enter into the grace period under the Secured Notes indenture and temporarily forego the Secured Notes interest payment due on July 1, 2016.  These negotiations ultimately stalled when the parties could not reach a definitive agreement on the terms of a restructuring and the consideration offered in exchange for the Secured Notes.  The Debtors made the interest payment on the Secured Notes before the expiration of the 30-day grace period.  While the parties were unable to reach an agreement at that time, these discussions developed the framework for the deal eventually struck in the RSA and reflected in the Plan.

### C.     Departure and Appointments of Certain Directors and Officers.

50.     Based on increasing concerns regarding the company's relationship with its significant customers and the secured bondholders, on November 11, 2016, the Goodman brothers, as the majority shareholders of Goodman, voted to increase the size of the Board of

18

Directors of Goodman from five to seven members.  The Goodman brothers then elected James Goodman, Jason Goodman, and Jonathan Goodman to fill an existing vacancy and the two newly-created vacancies on the Board.  Shortly thereafter, on November 15, 2016, all existing members of Goodman's Board of Directors other than John Goodman—including Steven Elfman, James Goodman, Jason Goodman, Jonathan Goodman, Larry Haynes, and Ron Hill— resigned from their positions as directors.  In their resignation letters, Messrs. Elfman, Hill, and Haynes stated that they were in disagreement with the other members of the Board on the direction of Goodman's business.  On November 15, 2016, John Goodman, as the sole remaining director, appointed Jason Goodman and Jonathan Goodman to fill those vacancies, and the Board of Directors then appointed John Goodman as Chairman of the Board of Directors and Executive Chairman.

51.    On November 21, 2016, the Debtors received a letter of resignation from Goodman's then-current Chief Executive Officer and President, Ron Hill.  On that same day, the Debtors also received letters from six other senior officers seeking to terminate their employment relationships.  These senior officers included the Debtors' Executive Vice President and General Counsel, the Executive Vice President of Sales and Business Development, the Executive Vice President of Professional Services, the Executive Vice President of Business Operations and Business Analytics, the Executive Vice President of Human Resources, and the Executive Vice President and Chief of Staff.

52.    Following these resignations, John Goodman, as the Debtors' Executive Chairman, assumed the responsibilities of Chief Executive Officer and President on an interim basis.  On November 21, 2016, the Board of Directors also appointed Jason Goodman as Chief Operating Officer.  The following day, the Debtors entered into an engagement letter with FTI,

under which I was appointed to serve as the Debtors' interim Chief Financial Officer and principal accounting officer.

53.     On January 5, 2017, the Debtors entered into a confidential separation agreement and general release with Ron Hill, through which the Debtors resolved all matters related to Mr. Hill's departure from the company and provided Mr. Hill with certain severance payments and benefits.  In exchange, Mr. Hill granted a general release in favor of the Debtors and agreed to customary non-disparagement and confidentiality provisions.

###       D.       Appointment of Independent Director.

54.     As part of its efforts to maximize value for all stakeholders, Goodman appointed W. Farley Dakan as an independent and disinterested director (the "Independent Director") to its Board of Directors on January 6, 2017.  In the months since his appointment, the Independent Director has played a key role in the restructuring negotiations and the development of the RSA, the Plan, and related matters.  The Independent Director has closely followed all restructuring negotiations and considered all aspects of the RSA and the Plan as they were developed. Specifically, the Independent Director carefully evaluated the costs and benefits related to non-consensual versus consensual restructuring alternatives.  The Independent Director was also apprised of the Debtors' ongoing relationships with their key customers and the importance of the Debtors' MBE status to those customers.

###       E.       The Debtors' Entry Into the RSA.

55.     In November 2016, the Debtors, the Consenting Noteholders, the Consenting Equityholders, and AT&T renewed active negotiations.  The parties considered numerous alternatives that would reduce the Debtors' outstanding debt obligations and maximize recoveries for all stakeholders.  As with past discussions, the parties focused their efforts on

transactions that would have a minimal impact on their customers, employees, vendors, and other stakeholders, while preserving the full benefits of the Debtors' MBE certifications.

56.     In December 2016, the Debtors, the Consenting Noteholders, the Consenting Equityholders, and AT&T reached a preliminary agreement on the terms of the restructuring, which terms eventually formed the basis for the RSA and the Plan.  The parties continued active negotiations over the following month.  In connection with these negotiations, the Debtors did not make the approximately $20 million interest payment on the Secured Notes due on January 3, 2017.

57.     On January 24, 2017, the Debtors, the Consenting Noteholders, and the Consenting Equityholders entered into the RSA, which serves as the foundation for these prepackaged chapter 11 cases and the Plan.  In connection with the Debtors' entry into the RSA, the Independent Director concluded that the agreement and the contemplated transactions were in the best interests of all parties in interest—including the holders of Secured Notes and Goodman Interests, as well as the Debtors' customers, vendors, employees, and other stakeholders—and would maximize the value of the Debtors' estates.  In particular, the Independent Director carefully scrutinized the contemplated recoveries of the holders of Goodman Interests and the Goodman MBE Group and determined, in consultation with the Debtors' advisors, that those distributions were fair and in the best interest of all stakeholders because of the importance of the Debtors' MBE status.  Based on that analysis, the Independent Director authorized the Debtors to enter into the RSA.

58.     The RSA and the Plan are predicated on preventing disruptions to the Debtors' business and protecting the MBE certifications.  To that end, the RSA contemplates full payment of all general unsecured creditors in the ordinary course.   In addition, the Consenting

21

Noteholders will receive a package of cash, common stock in Reorganized Goodman, New PIK Preferred Stock, and New Secured Notes, and the holders of Goodman Interests will retain a significant ownership stake in Goodman.   These are substantial recoveries for both groups, especially given the company's current challenges and performance.

59.     Pursuant to the RSA, the Consenting Noteholders and the Consenting Equityholders are bound to vote in favor of, and otherwise support, the Plan.  The RSA sets forth certain milestones for these chapter 11 cases and consummation of the Plan, including that the Debtors will obtain entry of an order confirming the Plan within sixty days of the Petition Date. On February 27, 2017, the Debtors and the Consenting Parties amended the RSA to, among other things, extend the milestone by which date the Debtors must commence the chapter 11 cases to March 13, 2017.

**F.     The Debtors' Paydown of the Prepetition Credit Facility and the Exit Facility.**

60.     Following entry into the RSA, the Debtors and their advisors engaged in arm's-length discussions with the Credit Facility Lender regarding the treatment of the Credit Facility under the Plan, a potential amendment, restatement, and extension of the Credit Facility, and the Credit Facility Lender's willingness to provide exit financing to the reorganized Debtors. As a result of those negotiations, and in consultation with the advisors for the Consenting Noteholders, the Debtors and the Credit Facility Lender reached an agreement through which (a) the Credit Facility Lender would forbear on the exercise of any remedies on account of the defaults arising from the Debtors' failure to make the Secured Notes interest payment due January 1, 2017, (b) the Debtors would pay down the entire amount outstanding under the Credit Facility before the Petition Date, and (c) the Credit Facility Lender would provide an exit financing facility on substantially the same terms as the Credit Facility.

61.     The Debtors and the Credit Facility Lender, together with the advisors for the Consenting Noteholders and in consultation with the Consenting Equityholders, also negotiated and agreed upon the principal terms of the Exit Facility, in the form of a revolving credit facility with an aggregate borrowing availability of $25 million, and MidCap Financial Trust, as administrative agent.  The parties documented the principal terms of the Exit Facility in that certain term sheet, dated as of March 2, 2017, a copy of which is attached as **Exhibit A** to the Plan.  Namely, the Exit Facility will have terms and conditions substantially similar to the Credit Facility agreement and will be secured on a first-priority basis on certain of the reorganized Debtors' assets.

62.     On March 8, 2017, the Debtors paid approximately $746,465.70—through offsetting collected amounts on hand—to the Credit Facility Lender to fully satisfy all remaining obligations under the Credit Facility, and terminated the Credit Facility agreement.[7]  As of the Petition Date, the parties continue to negotiate the terms of the Exit Facility.

**G.     The Debtors' Proposed Disclosure Statement and Solicitation Process.**

63.     Following the execution of the RSA, the Debtors commenced a prepackaged solicitation of the Plan on March 3, 2017, by delivering a copy of the Plan and related disclosure statement (including ballots) to the holders of Secured Notes and Goodman Interests, the only classes entitled to vote to accept or reject the Plan.  The Debtors have established April 3, 2017, at 4:00 p.m., prevailing Central Time, as the deadline for the receipt of votes to accept or reject the Plan.

---

[7]     In connection with the issuance of the Credit Facility and the Secured Notes, on June 23, 2011, PNC Bank, National Association, as administrative agent under the Credit Facility, U.S. Bank National Association, as collateral trustee under the Secured Notes indenture, and Goodman entered into that certain Intercreditor Agreement.  The Intercreditor Agreement set forth the rights and responsibilities of the parties thereto with respect to enforcement and turnover provisions in the event of a bankruptcy filing.  Due to the termination of the Credit Facility, the Intercreditor Agreement also terminated before the Petition Date.

KE 45147417

64.     The Debtors have requested that the Court schedule a hearing to confirm the Plan on April 19, 2017, in the *Debtors' Emergency Motion for Entry of an Order (A) Scheduling Combined Disclosure Statement Approval and Plan Confirmation Hearing, (B) Approving the Solicitation Procedures and Dates, Deadlines, and Notices Related Thereto, (C) Directing that a Meeting of Creditors Not Be Convened, and (D) Granting Related Relief* (the "Solicitation Motion"), filed contemporaneously herewith.   The following table sets forth the Debtors' proposed timeline for these chapter 11 cases and confirmation of the Plan:[8]

| Event | Date |
|---|---|
| Voting Record Date | March 2, 2017 |
| Commencement of Prepetition Solicitation | March 3, 2017 |
| Petition Date | March 13, 2017 |
| Distribution of Confirmation Hearing Notice | No later than two Business Days after entry of the order approving the Confirmation Hearing Notice |
| Plan Supplement | No later than seven calendar days prior to the Voting Deadline |
| Voting Deadline | April 3, 2017, at 4:00 p.m., prevailing Central Time |
| Objection Deadline | April 12, 2017, at 4:00 p.m., prevailing Central Time, or such other date as the Court may otherwise determine |
| Deadline to File Reply Brief | April 17, 2017, at 4:00 p.m., prevailing Central Time, or such other date as the Court may otherwise determine |
| Confirmation Hearing Date | April 19, 2017, or such date as the court may otherwise determine |

**Part III.**
**First Day Pleadings**

65.     Contemporaneously herewith, the Debtors have filed a number of first day pleadings in these chapter 11 cases seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these

---

[8]    Capitalized terms used but not otherwise defined in this table shall have the meanings ascribed to them in the Solicitation Motion.

KE 45147417

chapter 11 cases, and expedite a swift and smooth restructuring of the Debtors' balance sheet.

The first day pleadings include:

- *Debtors' Emergency Motion for Entry of an Order (A) Directing Joint Administration of Chapter 11 Cases and (B) Granting Related Relief;*

- *Debtors' Emergency Application for Entry of an Order Authorizing the Debtors to Employ and Retain Kurtzman Carson Consultants LLC as Noticing, Claims, and Balloting Agent, Effective Nunc Pro Tunc to the Petition Date;*

- *Debtors' Emergency Motion for Entry of an Order (A) Authorizing the Filing of a Consolidated List of Creditors, (B) Extending the Time, and, Upon Plan Confirmation, Waiving the Requirement, to File Schedules of Assets and Liabilities and Statements of Financial Affairs, and (C) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to the Secured Notes Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, (B) Continue Ordinary Course Incentive Programs for Non-Insiders, and (C) Continue Employee Benefits Programs, and (II) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of an Order (A) Authorizing the Debtors to Pay Accounts Payable Claims in the Ordinary Course of Business, (B) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders, and (C) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition and Renew, Amend, Supplement, Extend, or Purchase Insurance Policies in the Ordinary Course of Business and (B) Honor the Terms of the Premium Financing Agreements, Pay Premiums Thereunder, and Enter Into New Premium Financing Agreements in the Ordinary Court of Business, and (II) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of an Order (A) Authorizing the Payment of Certain Prepetition Taxes and Fees and (B) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of an Order (A) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (B) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Services, (C) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (D) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (B) Granting Related Relief; and*

- *Debtors' Emergency Motion for Entry of an Order (A) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (B) Approving the Solicitation Procedures and Dates, Deadlines, and Notices Related Thereto, (C) Directing that a Meeting of Creditors Not Be Convened, and (D) Granting Related Relief.*

66.     The first day pleadings seek authority to, among other things, obtain use of cash collateral on an interim basis, honor employee-related wages and benefits obligations, pay prepetition accounts payable claims in the ordinary course of business, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption.  I believe that the relief requested in the first day pleadings is also necessary to allow the Debtors to successfully implement the Plan and promptly emerge from chapter 11.

67.     Several of the first day pleadings request authority to pay certain prepetition claims.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedures provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate an irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Other relief will be deferred for consideration at a later hearing. Moreover, I understand that the Plan will provide for payment in full of all prepetition claims in

the ordinary course, except for those claims relating to the Secured Notes or those claims for which the holder agrees to less favorable treatment.

68.     I am familiar with the content and substance of the first day pleadings.  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the first day pleadings is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully restructuring the Debtors' businesses.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

KE 45147417

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  March 13, 2017                     */s/ John Debus*
_____
                                          John Debus
                                          Interim Chief Financial Officer
                                          Goodman Networks Incorporated

## **Certificate of Service**

I certify that on March 13, 2017, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Stephen M. Pezanosky*
One of its Counsel